■ SEAN GANESS, Appellant, v CITY OF NEW YORK et al., Respondents. [616 NYS2d 510] —In a negligence action to recover damages for medical malpractice, the plaintiff appeals from an order of the Supreme Court, Queens County (Lonschein, J.), dated May 17, 1991, which granted the motion of the defendant New York City Health and Hospitals Corporation to dismiss the complaint on the ground that the plaintiff's notice of claim was not timely filed and which denied the plaintiff's cross motion to dismiss the affirmative defense based on the Statute of Limitations.

Ordered that the order is affirmed, with costs to the respondent New York City Health and Hospitals Corporation.

The plaintiff was born at Elmhurst General Hospital on August 6, 1973. According to the notice of claim, the plaintiff was born with a condition known as "Erbs Palsy". The plaintiff alleges that this condition and the symptoms related to it could have been avoided "by appropriate prenatal interpartum and neonatal care". In his bill of particulars, the plaintiff specifies numerous instances of alleged medical malpractice relating to the prenatal and neonatal care delivered by the agents of the New York City Health and Hospitals Corporation (hereinafter the HHC), which operates Elmhurst Hospital.

The complaint states that "within ninety (90) days after the Cause of Action accrued" the plaintiff filed a notice of claim. This is manifestly incorrect because the plaintiff's cause of action in fact accrued on August 6, 1973, and no notice of claim was filed until more than ten years later, on May 18, 1984. In their answer, the defendants admitted that a claim was presented to the Comptroller of the City of New York on

May 18, 1984. However, they asserted an "affirmative defense" based on allegations that the plaintiff's action had not been commenced "within the time specified in § 7401 of the Unconsolidated Law *[sic]* of New York State and § 50-i of the General Municipal Law".

On August 1, 1989, the HHC made a motion to dismiss the complaint insofar as asserted against it. The plaintiff cross-moved for an order dismissing the HHC's "Statute of Limitations" defense or, in the alternative, for an order "deeming the Notice of Claim a[s] timely served, nunc pro tunc". In an order dated November 13, 1989, the Supreme Court correctly stated that "the plaintiff's [notice] of claim can be deemed timely only if there was a continuous course of treatment from the birth until not earlier than ninety days before the service of the notice of claim". The court granted the HHC leave to renew its motion in order to present evidence as to the possible applicability of the continuous treatment doctrine.

The HHC renewed its motion to dismiss on June 29, 1990. The HHC submitted the affidavit of Dr. Beatrice Kaplan, who diagnosed the plaintiff's condition on August 7, 1973 and who saw him periodically thereafter. Dr. Kaplan stated that she saw the plaintiff in November of 1979 and August of 1983, but that "nothing was done other than a checking of his condition".

After the HHC renewed its motion to dismiss, the plaintiff renewed his cross motion to dismiss the HHC's affirmative defense based on the Statute of Limitations. In support of this application, the plaintiff's attorney stated that the last "documented" visit (that is, the last visit by the plaintiff to Elmhurst Hospital for which any written record has been produced) occurred on September 21, 1983. The plaintiff's expert physician also asserted, based on his review of those records which had been produced, that the last visit for which written proof existed occurred on September 21, 1983. However, the plaintiff's attorney noted that the parents of the infant plaintiff had testified at a General Municipal Law § 50-h hearing, that they had brought the plaintiff to Elmhurst Hospital for a further visit in 1984 and that they had scheduled an appointment for 1985. Examination of the record of the parents' hearing testimony reveals that this visit occurred in October of 1984 and that the subsequent visit was scheduled for April of 1985. Thus, both appointments were after the notice of claim had been filed. Nelson Ganess, the plaintiff's father, also

submitted an affidavit in which he stated that an additional visit occurred in 1986.

In an order dated May 17, 1991, the Supreme Court granted the HHC's motion. For the following reasons, we affirm.

The 90-day notice of claim provision applicable to medical malpractice actions brought against the HHC is to be found in the "New York City Health and Hospitals Corporation Act" (McKinney's Uncons Laws of NY § 7381 *et seq.).* According to the provisions of this act, no action for damages due to personal injuries may be brought against the HHC "unless a notice of intention to commence such action * * * shall have been filed * * * within ninety days after such cause of action shall have accrued" (McKinney's Uncons Laws of NY § 7401 [2]). The force of this 90-day deadline is moderated somewhat in that it is subject to "[a]ll the provisions of section fifty-e of the general municipal law" (McKinney's Uncons Laws of NY § 7401 [2]). Because the infant plaintiff's cause of action accrued in 1973, the present case is governed by those provisions which were contained in the version of General Municipal Law § 50-e which was in effect prior to a 1976 amendment (L 1959, ch 814; *see, Matter of Beary v City of Rye,* 44 NY2d 398, 413; *Aponte v Bellevue Hosp. Ctr.,* 183 AD2d 594; *Grellet v City of New York,* 118 AD2d 141, 143-145).

Under the pre-1976 terms of General Municipal Law § 50-e (5), a notice of claim filed more than 90 days following the accrual of a plaintiff's cause of action based on personal injuries was considered a nullity. The courts had no power to grant an extension of the 90-day period applicable in such cases unless the application for such relief was shown to have been made within one year *(see, Matter of Martin v School Bd.,* 301 NY 233; *see also, Matter of Cohen v City of New York,* 19 AD2d 722, *affd* 14 NY2d 659; *Schiermeyer v Averill Park Cent. School Dist. No. 1,* 42 AD2d 654; *Matter of Freifeld v New York City Hous. Auth.,* 17 AD2d 854; *Matter of Jackson v New York City Hous. Auth.,* 15 AD2d 957; *Chikara v City of New York,* 10 AD2d 862). In accordance with this rule, the Supreme Court held, and it is not challenged on appeal, that the plaintiff's action had to be dismissed unless the running of the applicable 90-day prescriptive period was shown to have been suspended by operation of the continuous treatment doctrine for the period of time which elapsed between August 6, 1973, when the plaintiff was born, and February 18, 1984, 90 days before the notice of claim was filed *(see, Grellet v City of New York,* 118 AD2d 141, *supra).* We agree with the Supreme Court that the plaintiff failed to meet his burden on

this issue *(see, e.g., Massie v Crawford,* 78 NY2d 516; *Rizk v Cohen,* 73 NY2d 98).

The evidence in the record includes a ten-year-long chronology of the "Sean Ganess Clinic Visits". This chronology, submitted to the court by the plaintiff, itemizes the nature of the 44 visits which took place between November 30, 1973, and September 21, 1983. Several of the 34 pre-1979 notations describe the corresponding visits as having involved the prescription of exercise programs or physiotherapy. The ten notations which refer to the visits which took place since 1979 are as follows:

| | |
|---|---|
| "5/2/79 | Regular physical |
| 11/27/79 | Basically no change (good to normal hand function) |
| 11/29/79 | Physical |
| 5/7/80 | Physical exam |
| 5/6/81 | Evaluation of erb's palsy |
| 8/18/81 | Physical examination |
| 5/18/82 | Checked erb's palsy, checked for signs of scoliosis, told to return in one year |
| 5/19/82 | Complete evaluation, monitored for curvature of the spine |
| 8/19/83 | Follow up on erb's palsy |
| 9/21/83 | Flexion/contracture of left arm checked, hip unchanged". |

In our view, this evidence submitted by the plaintiff himself demonstrates that, at least as of 1979, the plaintiff was receiving no more than routine physical examinations. The fact that the routine examinations undergone by the plaintiff might have included the monitoring or evaluation of the medical condition with which he was born does not mean that he was being treated for that condition.

The continuous treatment doctrine has been held to be inapplicable where the patient's continuing visits to the treating physician were not part of a continuing effort to combat the symptoms of the disease for which the plaintiff sought compensation *(see, e.g., Cooper v Kaplan,* 78 NY2d 1103; *Massie v Crawford,* 78 NY2d 516, *supra; Nykorchuck v Henriques,* 78 NY2d 255; *Charalambakis v City of New York,* 46 NY2d 785; *Schroeter v Paley,* 203 AD2d 551). In other words, routine examinations meant to monitor a patient's physical condition may not serve as a pretext for suspending the

running of the applicable period of limitations *(e.g., Cassara v Larchmont-Mamaroneck Eye Care Group,* 194 AD2d 708; *Landau v Salzman,* 129 AD2d 774; *Grellet v City of New York,* 118 AD2d 141, *supra).*

Once the defendants produced competent evidence in the form of Dr. Kaplan's affidavit that between 1978 and 1983 "nothing was done other than a checking of [the plaintiff's] condition", so as to establish that there was no continuous treatment for a period of time which exceeded the applicable Statute of Limitations *(see, Farina v Rish,* 194 AD2d 642; *Grellet v City of New York,* 118 AD2d 141, *supra; Sherry v Queens Kidney Ctr.,* 117 AD2d 663; *Barrella v Richmond Mem. Hosp.,* 88 AD2d 379), the plaintiff was required to produce competent evidence that some medical treatment was in fact administered during this time *(e.g., Massie v Crawford,* 78 NY2d 516, *supra; Rizk v Cohen,* 73 NY2d 98, *supra; Farina v Rish, supra; Washington v Elahi,* 192 AD2d 704; *Siegel v Wank,* 183 AD2d 158; *Pierre-Louis v Ching-Yuan Hwa,* 182 AD2d 55; *Polizzano v Weiner,* 179 AD2d 803). In our view, the plaintiff failed to satisfy this burden.

The plaintiff attempted to meet his burden by producing the affidavit of his expert physician, referred to above. Nothing in this physician's affidavit contradicts Dr. Kaplan's assertion that "nothing was done other than checking [the plaintiff's] condition" between 1978 and 1983. Instead, this physician asserted that the checking of the plaintiff's condition was itself "part of the continuous treatment" supposedly rendered by HHC's staff. If this "continuous treatment" consisted of any conduct other than the mere monitoring of the infant plaintiff's condition, which was concededly done, then the plaintiff's expert has failed to identify such conduct with sufficient clarity to be worthy of credit.

For the foregoing reasons, we conclude that the plaintiff failed to demonstrate the existence of an issue of fact with respect to the possible applicability of the continuous treatment doctrine in this case. The order appealed from should therefore be affirmed. Bracken, J. P., Lawrence and Pizzuto, JJ., concur.

Miller, J., dissents and votes to reverse the order appealed from, on the law, and deny the motion and grant the cross motion, with the following memorandum: Contrary to the conclusion of the majority, and that of the Supreme Court, I find that the plaintiff's notice of claim was timely filed when the applicable toll for continuing treatment is considered. The plaintiff was born at Elmhurst General Hospital on August 6,

1973. Allegedly as a result of medical malpractice during his birth, the plaintiff was found to be affected with a medical condition known as left Erbs Palsy. The evidence adduced in opposition to the HHC's motion to dismiss indicated that the plaintiff was repeatedly treated at Elmhurst General Hospital for this Erbs Palsy condition through 1986. The plaintiff's notice of claim was filed on May 18, 1984, and the action was commenced in December 1984, while the course of continuous treatment provided by Elmhurst General Hospital was ongoing.

The Supreme Court granted the HHC's motion to dismiss because, in its opinion, the plaintiff's condition was deemed to be permanent as of 1977 and any treatments provided thereafter were ameliorative rather than curative. The majority adopts that reasoning. Furthermore, determining that the rationale underlying the continuous treatment doctrine was to promote the continuation of the physician-patient relationship to work on a cure without interruption by a lawsuit, the Supreme Court held that the commencement of this suit by the plaintiff undermined the rationale of, and hence the need for, the continuous treatment doctrine. Stated simply, since the treatments received by the plaintiff would not lead to a cure, but were more in the nature of "checkups" of the plaintiff's "overall condition", the court concluded that the continuing examinations were not for the "same condition" caused by the alleged malpractice, and hence, did not constitute genuine continuous treatment resulting in a toll of the Statute of Limitations (see, Werner v Kwee, 148 AD2d 701). The majority implicitly adopts this conclusion as well. I disagree.

The fact of the matter is that the plaintiff, allegedly injured at birth, continued to seek treatment for this left Erbs Palsy at the HHC's hospital through 1986. The last medical report in the record on appeal indicates that the plaintiff was seen in September 1983 and was to return in one year. However, according to the uncontroverted affidavit of the plaintiff's father, the plaintiff was treated at the defendant's hospital through 1986. In 1984 the plaintiff reportedly saw an orthopedist who recommended surgical treatment. The plaintiff's mother also testified at a General Municipal Law § 50-h hearing in December 1984 that the plaintiff was still undergoing treatment at Elmhurst General Hospital under the care of Dr. Kaplan as well as other hospital physicians. She testified that the plaintiff was scheduled for an appointment in April 1985. Thus, the plaintiff's mother testified as to future ap-

pointments, which according to the plaintiff's father's affidavit, were in fact appointments actually kept. The plaintiff's medical expert stated, after reviewing the plaintiff's medical records, that the plaintiff's continuing treatment at the HHC's hospital was "a continuous course of treatment * * * for his [E]rb's [P]alsy and sequelae which include [sic] physical therapy, monitoring left arm flexion and contracture, and checking for scoliosis and the necessity for surgery". Clearly, this meets the definition of continuous treatment and constitutes more than just a routine examination.

The Court of Appeals has unequivocally held: "The 'continuing trust and confidence' which underlies the 'continuous treatment doctrine' *(Coyne v Bersani,* 61 NY2d 939, 940) does not necessarily come to an end upon a patient's last personal visit with his or her physician *(see, McDermott v Torre,* 56 NY2d 399, 406), when further treatment is explicitly anticipated by both physician and patient as manifested in the form of a regularly scheduled appointment for the near future, agreed upon during that last visit, in conformance with the periodic appointments which characterized the treatment in the immediate past. *(Compare, Davis v City of New York,* 38 NY2d 257.)* Thus, a patient remains under the 'continuous treatment or care' of a physician between the time of the last visit and the next scheduled one where the latter's purpose is to administer ongoing corrective efforts for the same or a related condition. Regardless of the absence of physical or personal contact between them in the interim, where the physician and patient reasonably intend the patient's uninterrupted reliance upon the physician's observation, directions, concern, and responsibility for overseeing the patient's progress, the requirement for continuous care and treatment for the purpose of the Statute of Limitations is certainly satisfied." *(Richardson v Orentreich,* 64 NY2d 896, 898-899.)

As the affidavit of the plaintiff's expert made clear, the plaintiff was treated at the HHC's hospital over an extended period through 1986, to correct the very condition that resulted from the HHC's alleged negligence. Although the HHC's expert, Dr. Kaplan, averred that she merely checked the plaintiff's condition in November 1979, and in August 1983, Dr. Kaplan could offer no relevant evidence whatsoever regarding the numerous other treatments on other dates provided by other physicians at the HHC's hospital, as testified to by the plaintiff's mother. In light of the HHC's failure to offer comprehensive proof as to the treatments the plaintiff did or did not receive throughout the entire course of treat-

ment, not only was it error for the court to conclude that the treatments received were for a different condition so as to preclude application of a continuous treatment toll, but the plaintiff's cross motion should have been granted since the plaintiff's evidence established the applicability of the continuous treatment toll as a matter of law.

I do not share the majority's view that the plaintiff received merely routine examinations to monitor his condition. Rather, the record supports the conclusion that ongoing medical treatments were being undertaken to improve the plaintiff's condition, by exercise and by surgery, if necessary. Furthermore, post-operative, diagnostic, or therapeutic treatments do constitute continuous treatment where the care provided is for the condition resulting from the alleged malpractice *(see, Fonda v Paulsen,* 46 AD2d 540).

It is beyond cavil that continuous treatment tolls the expiration of an otherwise applicable Statute of Limitations " 'when the course of treatment which includes the wrongful acts or omissions has run continuously and is related to the same original condition or complaint' " *(McDermott v Torre,* 56 NY2d 399, 405). The Supreme Court's reasoning, embellished by the majority, would preclude the application of this tolling doctrine in virtually every case presenting birth-related injuries that prove to be "incurable". However, whether a treatment focuses on a cure or on merely attempting to ameliorate the symptoms of a permanent condition is not the determinative factor as to whether the treatment is "continuous" and thus tolls the running of the statute. The Supreme Court's conclusion, and that of the majority, ignores the settled rule that the continuous treatment doctrine applies so long as there is a continuing relationship of trust and confidence between patient and physician *(see, Richardson v Orentreich,* 64 NY2d 896, *supra; Allen v Blum,* 196 AD2d 624). Such a relationship clearly continued in this case. Contrary to the majority's implicit conclusion, the mere filing of a notice of claim during the course of ongoing continuous treatment does not negate the continuing treatment toll for treatments following service of the notice of claim *(see, Petrushansky v New York City Health & Hosps. Corp.,* 102 AD2d 819).

As previously stated, since the plaintiff was under the continuous care of physicians at Elmhurst General Hospital for ongoing corrective efforts for his Erb's Palsy, the continuing treatment doctrine applies to this case to toll the running of the Statute of Limitations *(see, Richardson v Orentreich,* 64 NY2d 896, *supra).* Not only does the majority implicitly reject

the holding of *Petrushansky (supra),* it further ignores a second rationale supporting the application of the toll for continuous treatment. It enables a physician to continue to attempt to correct the past malpractice *(see, Barrella v Richmond Mem. Hosp.,* 88 AD2d 379, 383). If a patient and a health care provider both consent to continued curative efforts notwithstanding the commencement of a lawsuit, that is undeniably within the parties' prerogatives.

Moreover, the majority's position ignores the reality that numerous residents of the metropolitan area have no source of primary health care available to them other than that provided by municipal hospitals. That patients may continue to seek care from the very institution charged with malpractice is not surprising in this light nor should such patients be deprived of the benefit of the continuous treatment toll strictly as a result of their limited health care options. In short, the plaintiff continued to be treated by the HHC's hospital beyond the time he served his notice of claim and as a result the Statute of Limitations was thereby tolled *(see, Djordjevic v Wickham,* 200 AD2d 421; *cf., Massie v Crawford,* 78 NY2d 516; *Cassara v Larchmont-Mamaroneck Eye Care Group,* 194 AD2d 708).