(April 14, 2005)

■ IRIS PRINZ-SCHWARTZ et al., Appellants, v EVE LEVITAN, M.D., et al., Respondents, et al., Defendant [796 NYS2d 36]—

Order, Supreme Court, New York County (Eileen Bransten, J.), entered April 4, 2004, which granted defendants-respondents' motion and cross motion for partial summary judgment dismissing any claims for medical malpractice accruing prior to 2½ years before the commencement of the action, reversed, on the law, without costs, the motion and cross motion denied, and the matter remanded for further proceedings.

In this medical malpractice action alleging the failure to diagnose plaintiff's breast cancer, the issue to be decided is whether plaintiff's regularly scheduled breast examinations over the course of 12 years, which yielded negative results for breast cancer but occasionally indicated "fibrocystic changes" or other irregularities, constituted continuous treatment sufficient to toll the statute of limitations until the completion of plaintiff's treatment. Because the conflicting evidence in the record raises a triable issue of fact as to whether plaintiff was being monitored for a specific breast condition during the course of

these regular examinations, we reverse and deny defendants' motions.

Between 1986 and 2000, plaintiff Iris Prinz-Schwartz received annual or semi-annual breast examinations at defendant Memorial Sloan-Kettering-Guttman Diagnostic Center (Sloan-Kettering). With the exception of the September 2000 examination which led to the cancer diagnosis, each of these examinations resulted in negative findings for breast cancer. During some of the examinations, however, particularly those in 1988, 1992 and 1995, certain irregularities were noted in the examiner's reports despite the negative findings.

For instance, on plaintiff's second visit on May 11, 1988, the mammography report revealed "two masses in outer area of left breast (probable cyst)," and Sloan-Kettering advised plaintiff in a letter that it would like to examine plaintiff in six months "as part of our follow-up program." Plaintiff's follow-up mammogram in November 1988 was ruled negative and a one-year recall was recommended. However, the 1989 mammogram report also showed "fibrocystic changes."

Plaintiff's test results in her 1991 mammogram were completely normal. However, her January 1992 mammogram revealed fibrocystic changes in both breasts and an "asymmetrical density" in her left breast, requiring a follow-up six-month recall. The October 1992 examination revealed these same irregularities, but a subsequent May 1993 exam indicated that the asymmetrical density was no longer visible.

The results of plaintiff's May 1994 and July 1995 exam revealed bilateral "lumpy breasts," and the 1995 results also showed a "dense parenchymal pattern." However, these results were considered normal by defendants. The results of the 1996, 1997, 1998 and 1999 exams were all normal and did not identify any irregularities.

On October 27, 1999 (a week before her scheduled November 1999 examination), plaintiff complained to defendant Dr. Eve Levitan about "bumps" in her lower left neck. Dr. Levitan detected a smooth, nonattached lymph node in the left, supraclavicular area, and mobile cysts in both breasts. Since plaintiff's annual breast examination was already scheduled for November 5, 1999, plaintiff waited until the next week for that exam. Defendant Dr. Michael Cohen interpreted those exam results as negative and forwarded the same to Dr. Levitan. Plaintiff also sought a second opinion from defendant Dr. Robert Fafalak, M.D., who likewise concluded that the two nodes on plaintiff's neck did not require further treatment.

A September 2000 breast examination was performed by Dr.

Yitzchak Ariel, Dr. Levitan's associate, who detected a small cyst in plaintiff's left breast and ordered an immediate mammogram for the next day. Plaintiff's September 27, 2000 mammogram revealed a 1.2 centimeter mass of the left breast, which a needle biopsy confirmed as infiltrating ductal carcinoma.

Plaintiff commenced the instant action for medical malpractice against defendants on December 10, 2001. Her complaint and bill of particulars limited her malpractice allegations to acts or omissions "in or about 1998 and continuing through a continuous treatment until in or about November 2000."

After completion of discovery, defendants Sloan-Kettering and Dr. Cohen moved to dismiss as time-barred all claims of alleged malpractice arising prior to June 10, 1999. Dr. Levitan crossmoved for similar relief. Plaintiffs submitted opposition to the motion, including an expert affirmation of a doctor licensed to practice in New Jersey, alleging that plaintiff was under the continuous care and treatment of defendants from May 1988 through September 27, 2000 for a "fibrocystic breast condition."

Supreme Court granted the motion and cross motion for summary judgment, dismissing all claims of malpractice arising prior to June 10, 1999. The court held that because routine annual examinations are generally insufficient to establish a continuous course of treatment, the continuous treatment doctrine did not apply in this case. It found that the annual or semi-annual breast examinations of plaintiff were routine in nature and that no evidence existed that she was ever treated for a fibrocystic condition by defendants. We reverse.

An action for medical malpractice must be commenced within two years and six months of the date of accrual (CPLR 214-a; *see Massie v Crawford*, 78 NY2d 516, 519 [1991]), which generally occurs on the date the alleged malpractice takes place (*Massie* at 519). However, under the continuous treatment doctrine exception, the 2 1/2-year period does not begin to run until the end of the course of treatment "when the course of treatment which includes the wrongful acts or omissions has run continuously and is related to the same original condition or complaint" (*Borgia v City of New York*, 12 NY2d 151, 155 [1962]).

The premise underlying the continuous treatment doctrine is that "a patient should not be required to interrupt corrective medical treatment by a physician and undermine the continuing trust in the physician-patient relationship in order to ensure the timeliness of a medical malpractice action" (*Young v New York City Health & Hosps. Corp.*, 91 NY2d 291, 296 [1998], cit-

ing *Rizk v Cohen*, 73 NY2d 98, 104 [1989], and *Borgia*, 12 NY2d at 156).

However, "[a] patient's continuing general relationship with a physician, or routine, periodic health examinations will not satisfy the doctrine's requirement of 'continuous treatment' of the condition upon which the allegations of medical malpractice are predicated (*Massie v Crawford*, 78 NY2d 516, 519; *McDermott v Torre*, 56 NY2d 399, 406)" (*Young*, 91 NY2d at 296). "Thus, essential to the application of the doctrine is that there has been a course of treatment established with respect to the condition that gives rise to the lawsuit" (*Nykorchuck v Henriques*, 78 NY2d 255, 258-259 [1991]). "In the absence of continuing efforts by a doctor to treat a particular condition, none of the policy reasons underlying the continuous treatment doctrine justify the patient's delay in bringing suit" (*id.* at 259).

In this case, plaintiff argues that the annual or semi-annual breast examinations from 1988 to 2000 were part of a continuous treatment involving the monitoring of a fibrocystic breast condition first noticed in the 1988 breast exam. Plaintiff asserts that for purposes of the continuous treatment doctrine, "treatment" may consist of the consistent monitoring of a specific condition or abnormality for the purpose of detecting a disease (*see Garcia-Alano v Guttman Breast Diagnostic Inst.*, 188 AD2d 262, 264 [1992], *lv dismissed* 81 NY2d 1007 [1993]; *see also Close v Gorman*, 284 AD2d 1013 [2001] [defendant diagnosed plaintiff as having fibrocystic disease in both breasts and was monitoring that condition]; *Pace v Caron*, 232 AD2d 617 [1996] [record established that defendant monitored and treated plaintiff for fibrocystic breast condition for 15 years]).

Plaintiffs point to several factors allegedly indicating the monitoring of a specific breast condition. For instance, they cite the various breast abnormalities noted in several of the examination reports, including "probable cysts," "fibrocystic changes," "asymmetrical density" and "lumpy breasts." They also note that the examinations were scheduled at regular one-year intervals, and at least two of them were scheduled "follow-up" exams at a shorter six-month interval where irregularities had been found. For purposes of showing continuity, they also rely on the fact that the results of some of the examinations were compared to prior exams. In addition, the affirmation of plaintiff's expert asserts that the annual breast exams were not separate and discrete, but rather part of a continuing treatment to monitor her fibrocystic condition. According to plaintiffs, these facts support their argument that plaintiff's visits to defendant were part of " 'continuing efforts by a doctor to treat a

particular condition' " (*Gordon v Magun*, 83 NY2d 881, 883 [1994], quoting *Massie,* 78 NY2d at 519).

Defendants, on the other hand, rely on the fact that the breast exams were, for the most part, routine diagnostic exams resulting in normal findings. They further highlight the lack of awareness by plaintiff that she was being monitored for a specific breast condition. They conclude that plaintiff's annual breast examinations lacked the "[f]requency and intensity of a course of treatment or monitoring of [a] condition" (*Sinclair v Cahan,* 240 AD2d 152, 154 [1997]) to qualify as continuous treatment.

We conclude that defendants have failed to demonstrate as a matter of law that no continuous treatment existed prior to June 1999. It is undisputed that numerous irregularities were found in plaintiff's breasts between 1988 and 1995, and that on at least two occasions defendants were sufficiently concerned that they accelerated plaintiff's regularly scheduled exam from the usual one-year interval to six months. Further, it may be inferred from the irregularities noted in the examination reports that plaintiff had some awareness that the condition of her breasts was being monitored from year to year for the purpose of detecting breast cancer.

Nevertheless, on this record it cannot be determined as a matter of law whether the frequency and intensity of the monitoring of plaintiff's breasts rose to a level sufficient to qualify as continuous treatment. There are triable issues of fact as to whether plaintiff was being monitored for a specific medical condition and whether plaintiff was aware of this monitoring to an extent that the underlying purpose of the continuous treatment doctrine would be served by tolling the accrual of plaintiff's claim until the completion of her treatment (*see Oksman v City of New York,* 271 AD2d 213 [2000]; *Irizarry v New York City Health & Hosps. Corp.,* 268 AD2d 321 [2000]; *Hill v Manhattan W. Med. Group—H.I.P.,* 242 AD2d 255 [1997]). Concur—Sullivan, Nardelli and Gonzalez, JJ.

Buckley, P.J., dissents in a memorandum as follows: I would affirm Supreme Court's dismissal of any medical malpractice claims accruing prior to June 10, 1999, 2¹/₂ years before commencement of the action.

Plaintiff's annual breast examinations, and two semi-annual examinations, from 1988 through 1998 constituted routine, periodic examinations and not a continuous course of treatment for a particular condition (*see Nykorchuck v Henriques,* 78 NY2d 255 [1991]; *Massie v Crawford,* 78 NY2d 516 [1991]; *Shiffman v Harris,* 280 AD2d 752 [2001]). The fact that certain irregularities were noted in 1988, 1992 and 1995 does not alter that

conclusion, since the results were interpreted as negative and all other examinations, up to 2000, were completely normal. Naturally, the breasts were being "monitored" for the purpose of detecting breast cancer; that is the very reason for the examinations. Similarly, a comparison of new results with prior medical history is a prudent means of making the most accurate diagnosis possible.

Under the majority's analysis, an issue of fact as to continuous treatment would be raised in almost all situations where a patient returns to the same physician for annual checkups, provided the same area or areas are examined. Thus, the continuous treatment exception would become the general rule for failure to diagnose claims, and the statute of limitations would be tolled from the earliest patient visit. However, neither a continuing relationship between a physician and a patient, nor the continuing nature of a diagnosis, is sufficient to meet the requirements of the continuous treatment doctrine (*see Nykorchuck*, 78 NY2d at 259).

The rationale underlying the continuous treatment doctrine is that a patient should not have to interrupt ongoing treatment by the attending physician, who is in the best position to correct his malpractice; the doctrine is not designed to link every visit to a physician to create a new form of claim (*see id.* at 258).

The instant case does not fall within the unique set of circumstances present in *Oksman v City of New York* (271 AD2d 213 [2000]), relied upon by the majority. In *Oksman*, which involved the 90-day notice of claim period applicable to public corporations, the plaintiff visited the defendant clinic 15 times over the course of a single year, and there was evidence that the doctors advised plaintiff they would "keep an eye on" lobulated soft tissue density in her left breast, the location of her original and persistent complaints (*id.* at 214). Thus, that case presented more than yearly, routine examinations, as in the case at hand.